767 S.E.2d 11

**LAWYER DISCIPLINARY BOARD, Petitioner**

v.

**John F. HUSSELL, IV, a member of The West Virginia State Bar, Respondent.**

No. 13–0544.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 3, 2014.

Filed Nov. 25, 2014.

Jessica H. Donahue Rhodes, Esq., Lawyer Disciplinary Counsel, Charleston, West Virginia, for Petitioner.

Benjamin L. Bailey, Esq., Michael B. Hissam, Esq., Bailey & Glasser LLP, Charleston, West Virginia, for the Respondent.

BENJAMIN, Justice:

This is a lawyer disciplinary proceeding instituted by the Office of Disciplinary Counsel ("ODC") against John F. Hussell IV, ("Mr. Hussell"). ODC alleges that Mr. Hussell violated the Rules of Professional Conduct ("Rules") by engaging in a sexual relationship with his then-client Carolyn L.,[1] and by providing legal advice to her against her husband's interest, who was also Mr. Hussell's then-client. Concluding that the allegations had been proven by clear and convincing evidence, the Hearing Panel Subcommittee ("HPS") of the Lawyer Disciplinary Board recommended that Mr. Hussell's law license be suspended for ninety days, with automatic reinstatement. The HPS also recommended that Mr. Hussell's practice be supervised for one year by an attorney agreed upon between the ODC and Mr. Hussell. In addition, the HPS recommended that Mr. Hussell undergo a psychiatric evaluation to determine his fitness to practice law. Finally, the HPS recommended that Mr. Hussell pay the costs of this proceeding. Mr. Hussell and ODC agreed to the imposition of these sanctions.

This Court did not agree with the recommended disposition and scheduled the case for oral argument.[2] The Court has before it the recommendation of the HPS, all matters of record, the briefs, and the arguments of counsel. Based upon our review and for the reasons stated herein, this Court rejects the recommendations of the HPS and finds that because there was no attorney-client relationship between Mr. Hussell, and James and

---

1. Because of the sensitive nature of the facts alleged in this case, we have referred to the complainant, his wife and other members of his family, by the first initial of their surname. *See* *State v. Edward Charles L.,* 183 W.Va. 641, 645 n. 1, 398 S.E.2d 123, 127 n. 1 (1990).

2. This Court is not bound by the agreement between Mr. Hussell and ODC. Rule 3.12 of the Rules of Lawyer Disciplinary Procedure states that

> [i]f the Court does not concur with the recommended disposition, the Clerk of the Supreme Court of Appeals shall promptly establish a briefing schedule and notify the parties of the date and time of oral argument or submission of the case without oral argument before the Supreme Court of Appeals.

Carolyn L. at the time of the acts complained of herein, such joint relationship having ended by James L.'s firing of Mr. Hussell on January 10, 2010, Mr. Hussell did not violate the rules for which he was charged. Accordingly, we dismiss the Statement of Charges against Mr. Hussell.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The respondent, Mr. Hussell, is a lawyer practicing in Charleston, West Virginia. He was admitted to the West Virginia State Bar on October 3, 1994. This proceeding arises from the June 27, 2011, complaint of James L. James L. and his wife, Carolyn, jointly engaged Mr. Hussell's estate planning services on or near September 12, 2009.[3] James L. alleged in his complaint that Mr. Hussell violated the rules by engaging in a sexual relationship with Carolyn L. This sexual relationship began in March 2010 and ended in May 2010 after Carolyn L. terminated their relationship. James L. also alleged that prior to the beginning of their sexual relationship, Mr. Hussell and Carolyn L. engaged in frequent telephone conversations and were once found together at 5:30 a.m. in a remote area of Greenbrier County by Mr. Hussell's wife, all of which bothered James L. James L. further alleged that after he and his wife separated in January of 2010, Mr. Hussell gave legal advice to Carolyn L. that resulted in James having to pay more money to purchase her interest in jointly-held marital real estate.

A statement of charges was issued against Mr. Hussell on May 13, 2013. The statement of charges alleged that Mr. Hussell violated Rule 8.4(g) of the Rules of Professional Conduct, by engaging in sexual relations with Carolyn, a client, during the course of that representation. Mr. Hussell was also charged with violating Rule 1.7(a) of the Rules by providing independent legal advice concerning marital property and spousal support issues to Carolyn, which advice adverse-

ly affected James L.'s interests by increasing the amount of money he had to pay to purchase Carolyn's share of marital property. Finally, Mr. Hussell was also accused of violating Rule 1.7(b) by engaging in sexual relations with Carolyn at the same time he jointly represented her and James L., creating an impermissible conflict between Mr. Hussell's personal interests and his clients' interests. Mr. Hussell contested the allegations of wrongdoing in James L.'s complaint. Further, he denied that he represented either James L. or his wife during the time of the sexual relationship between himself and Carolyn L.

This matter was heard by the HPS on October 29, 2013. It is uncontested by Mr. Hussell that he and Carolyn engaged in a two-month-long sexual relationship from March 2010 to May 2010 that started after James and Carolyn L. separated and before a divorce action was filed in the State of Virginia.[4] It is also uncontested that both James and Carolyn L. retained separate counsel in the State of Virginia to represent them in these divorce proceedings.[5]

In finding that Mr. Hussell was Carolyn's attorney at the time of their sexual relationship, the HPS found that Mr. Hussell's conduct violated Rule 8.4(g), which states that it is professional misconduct for a lawyer to

> have sexual relations with a client whom the lawyer personally represents during the legal representation unless a consensual sexual relationship existed between them at the commencement of the lawyer/client relationship. For purposes of this rule, "sexual relations" means sexual intercourse or any touching of the sexual or other intimate parts of a client or causing such client to touch the sexual or other intimate parts of the lawyer for the purpose of arousing or gratifying the sexual desire of either party or as a means of abuse.

---

3. At the same time that James and Carolyn were planning their estate, other members of their extended family were using Mr. Hussell's services for the same purpose. James' father bore the costs of Mr. Hussell's services.

4. This relationship was terminated by Carolyn L., ostensibly via a text message.

5. James and Carolyn L were divorced in 2010. While they have not remarried, they resumed a relationship post-divorce and consider themselves reconciled as of the time of the hearing.

The HPS determined that, beginning in September of 2009, Mr. Hussell was jointly engaged by the L. family for the purpose of drafting and implementing a comprehensive estate plan. Prior to this time James and Carolyn L. and Mr. Hussell and his wife were acquainted and friendly with each other. During the time of the joint representation, in late 2009, James and Carolyn were experiencing marital problems. They separated in or near December of 2009.

James L. testified before the HPS that after he and Carolyn L. separated, in or near December of 2009, he and Mr. Hussell discussed the particulars of his further representation of James and Carolyn L. in their unfinished estate plan. James L. testified that Mr. Hussell suggested that he could represent both James L. and Carolyn L., but would keep any information garnered from either one from the other spouse. On January 6, 2010, Mr. Hussell mailed a letter to James L. and Carolyn L. in which he stated that he could represent both James and Carolyn and that he could keep their information separate and confidential from the other spouse, if that is what they wanted.

Four days later, on January 10, 2010, Mr. Hussell and James L. were both at the Greenbrier Resort, when James indicated that he wanted to talk to Mr. Hussell privately. James L. and Mr. Hussell both testified that during this exchange, James fired Mr. Hussell from his joint representation because of his concerns over the nature of his relationship with his estranged wife. Both testified that James L. stated that he had engaged the services of a trust officer to find another attorney to separately prepare James's estate documents. After this conversation took place, Carolyn L. also acknowledged to Mr. Hussell that he had been fired.

In testimony before the HPS, Carolyn L. acknowledged that sometime after January 10, 2010, she and Mr. Hussell discussed James L.'s termination of the joint representation. Carolyn L. knew that this conversation took place about the time that James L. moved out of the marital residence. She testified that James L. told her that he was not comfortable with Mr. Hussell representing him because of the friendship between Mr. Hussell and Carolyn L. While Carolyn L. could not recall whether the termination discussion took place in Lewisburg (at the site of their cabins) or at the Greenbrier, she acknowledged that she and Mr. Hussell discussed the event in at least one telephone conversation after January 10, 2010. Carolyn L. testified that she explained to Mr. Hussell her understanding that James L. had terminated the joint representation, because James L. was not comfortable with the amount of time she and Mr. Hussell were spending together. Four days after this termination of Mr. Hussell, on January 14, 2010, James and Carolyn L. signed the January 6, 2010, letter prepared by Mr. Hussell regarding the confidentiality of the information provided to Mr. Hussell and sent it to him. This letter was received by Mr. Hussell's office on or about January 22, 2010, and was placed in James' and Carolyn L.'s file. Nothing thereafter was done pursuant to the letter.

Mr. Hussell testified that he performed no further legal services for James and Carolyn L. after his termination on January 10, 2010. This was not refuted by James or Carolyn L., or by anything in the record. Billing records disclosed that Mr. Hussell performed a total of two and a half hours of work on their behalf, *all prior* to January 10, 2010. James L. ultimately used a Virginia attorney to prepare his estate plan. Mr. Hussell did not send a disengagement letter to James and Carolyn L.[6]

In her testimony, Carolyn L. stated that she never felt that there was an attorney-client relationship between herself and Mr. Hussell. She stated that the planning of her and James L.'s estate was primarily the work of James L. and his family,[7] and that she

---

6. The Court observes that the better practice in matters where an attorney-client relationship is terminated is to send such a letter that makes it clear that any obligations or responsibilities for further representation by the attorney are terminated.

7. James L. testified that his extended family's business holdings and investments were intertwined. Therefore, having one attorney prepare the entire family's estate plan was advantageous. James L. stated that his father was going to pay Mr. Hussell's fees for the entire family's estate planning.

took no part in any of the financial decisions in respect to the estate. Carolyn L. stated that "because of the fact that [Mr. Hussell] and I had become friends, I didn't really think of him as an attorney. I just thought of him as my friend."

In terms of Mr. Hussell's providing legal advice to Carolyn at the expense of James L.'s interests, the HPS found that Mr. Hussell discussed an alimony formula with Carolyn L. during the course of their sexual relationship. In addition, the HPS found that Mr. Hussell's suggestion that Carolyn L. obtain an independent appraisal of the marital property in Greenbrier County constituted legal advice that acted to the detriment of his client James. The HPS concluded that as a result of Carolyn L.'s obtaining an independent appraisal, the value of the jointly-held property was higher, which resulted in James L. having to pay more to purchase Carolyn's interests in that property. None of this "advice" related to confidential information conveyed to Mr. Hussell prior to January 10, 2010.

On April 17, 2014, the HPS issued its decision in this matter, concluding that Mr. Hussell violated three provisions of the Rules. The HPS found that Mr. Hussell engaged in a sexual relationship with a client, in violation of Rule 8.4(g). The HPS further found that by giving Carolyn L. legal advice regarding her pending divorce proceedings against James L. at a time when they were jointly represented by Mr. Hussell, he had a conflict of interest and violated Rule 1.7 of the Rules. Finally, because Mr. Hussell had contested the existence of an attorney-client relationship between himself and James and Carolyn L., the HPS found that Mr. Hussell knowingly made a false statement of material fact in the course of a disciplinary proceeding in violation of Rule 8.1, as well as violating Rule 8.4(c) by engaging in conduct that involves dishonesty, fraud, deceit or misrepresentation.

The HPS recommended that Mr. Hussell's law license be suspended for a period of 90 days, that Mr. Hussell be automatically reinstated to the practice of law without further proceedings, that Mr. Hussell's practice be supervised for a period of one year after reinstatement, that Mr. Hussell undergo a psychiatric evaluation, and that Mr. Hussell

bear the costs of this proceeding. Mr. Hussell and ODC agreed to the sanctions recommended by the HPS. This Court did not agree with the recommended disposition and implemented a briefing schedule.

## II. STANDARD OF REVIEW

■ In lawyer disciplinary proceedings, this Court reviews *de novo* the recommended decision of the Lawyer Disciplinary Board's HPS:

> A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. pt. 3, *Comm. on Legal Ethics of the W. Va. State Bar v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994). This review is deferential to the HPS's conclusions. "Absent a showing of some mistake of law or arbitrary assessment of the facts, recommendations made by the State Bar Legal Ethics Committee ... are to be given substantial consideration." Syl. pt. 3, in part, *In re Brown*, 166 W.Va. 226, 273 S.E.2d 567 (1980).

■ This Court is responsible for determining the ultimate resolution of lawyer disciplinary proceedings. As such, "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. pt. 3, *Comm. on Legal Ethics of The W. Va. State Bar v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984). The appropriate sanction is likewise the responsibility of this Court, with three distinct goals in mind: punishment, deterrence and maintenance of the public's trust and confidence in the lawyers that serve this State. *See Lawyer Disciplin-*

*ary Bd. v. Stanton,* 225 W.Va. 671, 676, 695 S.E.2d 901, 906 (2010).

With these standards in mind, we now proceed to consider the HPS's recommended decision and the parties' contentions.

## III. ANALYSIS

■ As a threshold issue, in order to sustain the findings and conclusions of the HPS, there must have existed at the time of the charged violations an attorney-client relationship between Mr. Hussell, James and Carolyn. If, as Mr. Hussell argued below and upon appeal, there was not an attorney-client relationship at certain relevant times, the charges cannot be sustained. On the contrary, if the joint representation continued past January 10, 2010, the charges would be sustained.

It is uncontroverted that Mr. Hussell was jointly representing James and Carolyn L. in estate planning matters from approximately September 12, 2009, to at least January 10, 2010. The question before us is whether that representation continued after January 10, 2010, and on to the time period when Mr. Hussell and Carolyn L. first began their sexual relationship and when it is alleged that Mr. Hussell improperly gave Carolyn L. legal advice against the interests of James L. As noted herein, although Mr. Hussell admits to a sexual relationship with Carolyn L., he denies that he gave any improper legal advice to Carolyn regarding her divorce proceedings and that he encouraged her to speak with her Virginia attorney on matters involving her divorce.

The HPS found that the letter signed by James and Carolyn on January 14, 2010, established that an attorney-client relationship existed between Mr. Hussell and James on that date. As to the issue of an attorney-client relationship, this Court finds more compelling the termination of joint representation by James L. when he spoke with Mr. Hussell on January 10, 2010, and the fact that after January 10, 2010: Mr. Hussell performed no work for James and Carolyn L.; neither James nor Carolyn L. sought Mr. Hussell to perform work on their behalf, having each hired their own counsel in Virginia; and Mr. Hussell did nothing to signify his acceptance of new representation from the January 14, 2010, letter from James and Carolyn L. after the January 10, 2010, termination by James L. of his joint representation.

■ Long ago this Court established that the attorney-client relationship is a matter of contract, express or implied. In syllabus point 1 of *Keenan v. Scott,* 64 W.Va. 137, 61 S.E. 806 (1908), this Court stated that an attorney-client relationship begins

[a]s soon as the client has expressed a desire to employ an attorney and there has been a corresponding consent on the part of the attorney to act for him in a professional capacity, the relation of attorney and client has been established; and all dealings thereafter between them relating to the subject of the employment will be governed by the rules applicable to such relation.

In *Committee on Legal Ethics of the West Virginia State Bar v. Simmons,* 184 W.Va. 183, 399 S.E.2d 894 (1990), the attorney, Mr. Simmons, argued that there was no attorney-client privilege at the time he became involved in a financial transaction with two persons who were his clients. The specific charges against Mr. Simmons were that he entered into business transactions with longtime clients without making adequate disclosures to them, without providing adequate security or other legal means to protect their interests, and without referring them to independent counsel.

In *Simmons,* this Court concurred with other courts which have held that "an attorney-client relationship may be implied from the conduct of the parties" (citations omitted) and stated that the Court must "look to the specific facts and circumstances of each case to determine whether an attorney-client relationship exists." *Id.,* at 186, 399 S.E.2d at 897.

Examining the specific facts and circumstances of this case, along with the conduct of Mr. Hussell, James L. and Carolyn L., we agree with the HPS's finding that there jointly existed an attorney-client relationship between Mr. Hussell, James and Carolyn L. prior to January 10, 2010. This relationship was clearly established by correspondence, the parties' recollections and statements, and the preliminary work performed by Mr. Hussell on behalf of his clients.

When James and Carolyn L. separated, James L. contacted Mr. Hussell to get assurance that information he might give Mr. Hussell would not be relayed to his estranged wife, Carolyn L. Mr. Hussell wrote a letter to James and Carolyn L. dated January 6, 2010, to acknowledge the changed circumstances and to attempt to confirm for James L. the privacy of the information he might give to Mr. Hussell. However, prior to this letter being signed and returned to Mr. Hussell on January 14, 2010, the intervening conversation between James L. and Mr. Hussell took place on January 10, 2010, during which James L. definitely ended the joint attorney-client relationship. Carolyn L.'s testimony confirms this termination of representation, as does Mr. Hussell's. In keeping with the termination, Mr. Hussell thereafter took no further legal action on behalf of James and Carolyn L. and billed for no further time. Equally important, there is no indication that either James or Carolyn L. undertook any action, such as contacting Mr. Hussell to discuss the progress of their estate plan or to indicate that they believed the joint representation continued past its ostensible termination on January 10, 2010. We find it reasonable that Mr. Hussell understood the January 10, 2010, conversation for what it was—a termination of joint representation and that he reasonably believed that he was no longer counsel for James and Carolyn L.

The HPS's conclusion that the January 14, 2010, unilateral act of James and Carolyn L. in returning the January 6, 2010, representation letter after the discharge of Mr. Hussell re-established an attorney-client relationship is simply unsupported by reliable, probative, and substantial evidence on the whole record. Neither Mr. Hussell nor James and Carolyn L. did anything to signify a belief that representation had been re-established. Indeed, we observe that James and Carolyn L. engaged separate counsel in Virginia for their divorce. Based upon the totality of circumstances, we find that there was no attorney-client relationship between Mr. Hussell and James and Carolyn L. after January 10,

2010. Consequently, any sexual relationship between Mr. Hussell and Carolyn L. past that date could not violate Rule 8.4(g) of the Rules.[8] Furthermore, because there was no attorney-client relationship between himself and either James or Carolyn L., Mr. Hussell did not violate Rule 1.7 of the Rules by giving legal advice that adversely affected the interests of another client. Finally, we find that Mr. Hussell did not knowingly make a false statement of material fact during the course of these disciplinary proceedings, in violation of Rule 8.1. Mr. Hussell's statements consistently challenged the existence of an attorney-client relationship between himself and James and Carolyn L. after January 10, 2010.

## IV.  CONCLUSION

For the foregoing reason, we dismiss the Statement of Charges against Mr. Hussell.

Statement of Charges Dismissed.

JUSTICE WORKMAN concurs and reserves the right to file a separate opinion.

JUSTICE KETCHUM dissents and reserves the right to file a separate opinion.

JUSTICE LOUGHRY dissents and reserves the right to file a separate opinion.

Justice WORKMAN, concurring:

I concur with the decision of the majority in this case. As explained by the majority, the HPS found that attorney John Hussell violated the West Virginia Rules of Professional Conduct and recommended that Mr. Hussell be sanctioned by suspension for ninety days, supervised practice for one year, psychiatric treatment, and reimbursement of costs. In the vast majority of lawyer disciplinary cases, this Court adopts such findings and recommendations. However, this Court has the ultimate decision-making authority on lawyer ethics and on occasion decides to set the matter for full hearing, after which it may accept or modify the HPS recommendations. As succinctly stated in *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994), "this Court independently examines each case on its own merits in

---

8. Our inquiry is limited to the disciplinary issues before us. We do not consider the propriety, or lack thereof, of the relationship between Mr. Hussell and Carolyn L. outside of the context of the issues before us.

determining what, if any, disciplinary action is warranted." 192 W.Va. at 290, 452 S.E.2d at 381.[1] Ironically, this matter was set for a full hearing due to our concerns regarding possible over-leniency in this disciplinary action against lawyer John Hussell.

Having examined this matter in its entirety, with due regard to the applicable standards of review,[2] it is now clear that there is no factual dispute that the sexual relationship between Mr. Hussell and Mrs. Carolyn L. did not commence until all legal representation in the estate planning matters had concluded. Again, there is no factual dispute that Mr. James L. discharged Mr. Hussell as attorney in these matters and that no further legal representation by Mr. Hussell was thereafter undertaken. What muddies up the waters is that, prior to Mr. James L. terminating Mr. Hussell, a letter outlining the "rules" of continued joint representation of the L's designed to protect each of their interests had been sent to the L's. It is unclear why Mr. L signed and returned the letter in view of the fact that he had just fired Mr. Hussell shortly before.

Additionally, the HPS felt that Mr. Hussell improperly represented Mrs. Carolyn L. in connection with the divorce pending between the L's by giving her legal advice on marital property and alimony matters. Mr. Hussell did not undertake any type of representation of Mrs. L. in the divorce matter. Consequently, the majority concludes that Mr. Hussell did not commit an ethical violation sanctionable by the West Virginia Rules of Professional Conduct. Had the evidence demonstrated that a sexual relationship existed between Mr. Hussell and Carolyn L. during Mr. Hussell's legal representation of her and/or her husband, this Court unquestionably would have found violations of the Rules of Professional Conduct, and Mr. Hussell would have been sanctioned accordingly.

The wiser course for Mr. Hussell to have followed was to memorialize the termination of the legal representation agreement in this matter by means of an unequivocal disengagement letter by Mr. Hussell. Although there is no current ethical rule that requires such a disengagement letter, if an attorney wishes to avoid allegations of ethics violations for questionable conduct with a former client, he or she would be well-advised to specifically and emphatically memorialize key elements of the process of legal representation and its termination.

In consequence of our full review of this record, I must concur with the majority that the HPS failed to prove the charges contained in its report by clear and convincing evidence.[3] Hopefully, though, this case will

1. Rule 3.12 of the Rules of Lawyer Disciplinary Procedure provides:
    If the parties consent to the recommended disposition, the matter shall be filed with the Supreme Court of Appeals for entry of an order consistent with the recommended disposition. If the Court does not concur with the recommended disposition, the Clerk of the Supreme Court of Appeals shall promptly establish a briefing schedule and notify the parties of the date and time of oral argument or submission of the case without oral argument before the Supreme Court of Appeals. Whenever the Office of Disciplinary Counsel advocates any position before the Supreme Court of Appeals which differs from findings of fact, conclusions of law, or recommended disposition of the Hearing Panel Subcommittee, it shall provide notice to the Hearing Panel Subcommittee, whether by service of a copy of its brief or otherwise, and the Hearing Panel Subcommittee shall be permitted, if it so desires, to file, within thirty days of receipt of such notice, its own brief before the Supreme Court of Appeals, in support of its findings of fact, conclusions of law, and recommended disposition. Following oral argument or submission of the

case without oral argument, the Court will file an opinion or order disposing of the case. Unless otherwise provided in the Court's opinion or order, any sanction will not take effect until after expiration of the rehearing period or the denial of any petition for rehearing.

2. "A *de novo* standard applies to a review of the adjudicatory record made for the Committee on Legal Ethics of the West Virginia State Bar [currently, the Hearing Panel Subcommittee of the Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's finding of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." *McCorkle*, 192 W.Va. at 287, 452 S.E.2d at 378, syl. pt. 3.

3. Rule 3.7 of the West Virginia Rules of Lawyer Disciplinary Procedure states: "In order to rec-

capture the attention of the Bar for the principle that attorneys should document termination of representation agreements for both the clients' protection as well as the lawyers' protection.

Justice KETCHUM, dissenting:

The Hearing Panel recommended Mr. Hussell be suspended for 90 days. Mr. Hussell agreed with the suspension, saying in his brief that he "requests that the recommended sanctions be imposed." At oral argument, Mr. Hussell's lawyer insisted that we should adopt the Hearing Panel's recommended 90–day suspension. A lawyer would not agree with a suspension if he/she hadn't breached the Rules of Professional Conduct. I would therefore have suspended Mr. Hussell for 90 days.

There will be many lawyers who will grouse that the majority opinion took it easy on Mr. Hussell. Nothing is farther from the truth. There is *absolutely no evidence* that Mr. Hussell did any legal work or represented James and Carolyn L. during the time he had an extra-marital affair with Carolyn L. The extra-marital affair started after Hussell was fired as the estate lawyer for James and Carolyn L.

Hussell and the L. family became acquainted around 2008 after Hussell and his family purchased property and built a cabin in Greenbrier County near property owned by James and Carolyn L. Soon thereafter, Hussell and his wife and children became social acquaintances of James and Carolyn L. and their family. On September 12, 2009, Hussell was hired by multiple members of the L. family to assist them with estate-planning services.

On November 3, 2009, Hussell met in his office in Charleston with James and Carolyn L. (James L. participated by phone) to have them fill out a standard questionnaire for estate-planning clients. The meeting quickly ended, however, when James and Carolyn L. were unable to complete the questionnaire due to their disagreement over the guardianship of their children in their wills. After that meeting, James and Carolyn L. never

completed the estate-planning questionnaire nor provided the requested information. As a result, Hussell received no information during his representation regarding their assets or financial situation.

Consequently, Hussell did not perform any estate-planning work for James or Carolyn L. after the November 2009 meeting, nor did he ever have any communications with either of them regarding their estate planning after November 2009.

Around January 1, 2010, Carolyn L. telephoned Hussell and told him that she and James L. were separating. In addition, James L. asked if Hussell would keep his financial information separate from his wife's, Carolyn L. On January 6, 2010, Hussell mailed a letter to both James and Carolyn L. stating that he could represent both of them (a big mistake) if they gave their consent and that he would keep each spouse's financial information separate and confidential. James and Carolyn L. were to sign the letter and return it to Hussell.

Within a week, James L. indicated to Hussell that he wanted to speak with him privately. The meeting took place at the Greenbrier on January 10, 2010. At the meeting, James L. terminated Hussell's legal representation of himself and his wife, Carolyn L. James L. testified that he was uncomfortable with Hussell continuing the estate planning for him and his wife. He had already obtained a reference for another estate-planning lawyer in Roanoke, Virginia.

The termination on January 10, 2010, was not disputed. In fact, it was confirmed by Carolyn L. and by James L.'s sister. Carolyn L. recalled that her husband had a conversation with Hussell in January 2010, during which James L. told Hussell "that he wasn't comfortable with [Hussell] representing him because of the fact that [Hussell] and I were such good friends." In addition, James L.'s sister testified that she was present when James L. and Hussell stepped aside to speak privately in January 2010. She further testified that James L. told her that he had informed Hussell that he "just

proven by clear and convincing evidence."

didn't really *want to continue to have Hussell work with him.*" She indicated that Hussell was terminated.

Put simply, it is undisputed that Hussell was fired at the January 10, 2010, Greenbrier meeting. However, Hussell made another big mistake in not confirming his termination in a letter to James and Carolyn L.

The most important undisputed fact is that Hussell never performed any legal work for James or Carolyn L. after the Greenbrier meeting on January 10, 2010.

On January 22, 2010, twelve days after the Greenbrier termination, Hussell received back the letter he had sent to James and Carolyn L. which they signed and dated January 14, 2010. Both James and Carolyn L. signed the letter relating to separate representation and confidentiality. Having been previously fired, Hussell took no action and put the letter in the James L. billing file which is a file for "administrative things that are not substantive."

Hussell did not act on the letter because he had been fired. James and Carolyn L. never spoke again with Hussell about legal representation. Hussell never performed any legal work for James and Carolyn L. after he had been fired at the Greenbrier.

People can speculate all they want, but the majority opinion isn't off the mark. The undisputed evidence in the record is that the extra-marital affair between Hussell and Carolyn L. did not start until approximately three months after Hussell was fired at the Greenbrier on January 10, 2010. The only evidence presented was that the affair started three months later, in March 2010. No witness even surmised that the affair started before March 2010.

The ethical violations found by the Hearing Panel were that Hussell had a sexual relationship with his client, Carolyn L., and that he gave her divorce advice while he represented her and James L. However, all this occurred after he was fired on January 10, 2010, and after the extra-marital affair started in March 2010. Hussell had not acted as the lawyer for James and Carolyn L. for three months when the extra-marital affair began.

The Hearing Panel found that Hussell's representation was not terminated because he had received the letter from James and Carolyn L. which was signed by them four days after he was fired. The Hearing Panel found, because of the letter, Hussell was still the lawyer for both James and Carolyn L. when the affair began three months later. They also found he did not send a disengagement letter.

I respectfully disagree with the Hearing Panel. There is no ethical rule or case law that requires a lawyer to send a client a disengagement letter when he/she is fired. Hussell did nothing to indicate he represented James and Carolyn L. after he was fired at the Greenbrier. Hussell did nothing by way of legal work for James and Carolyn L. after the Greenbrier termination. He did nothing.

In order for the letter signed by James and Carolyn L. to be considered a re-engagement of Hussell as a lawyer, there must have been an acceptance by Hussell to act for James and Carolyn L. in a professional legal capacity. Our Court has held,

As soon as the client has expressed a desire to employ an attorney, and *there has been a corresponding consent on the part of the attorney to act for him in a professional capacity,* the relation of attorney and client has been established; and all dealing thereafter between them relating to the subject of the employment will be governed by the rules applicable to such relation.

Syllabus Point 1, *Keenan v. Scott,* 64 W.Va. 137, 61 S.E. 806 (1908) (emphasis added).

Mr. Hussell did not consent to a re-engagement to act as the lawyer for James and Carolyn L. He made a big mistake in not replying in writing to the letter. However, this does not amount to any ethical violation under the Rules of Professional Conduct.

Still, even with all this in mind, by forcefully advocating we adopt the Hearing Panel's recommended 90-day suspension, Mr. Hussell has conceded that he committed ethical violations. While I can't find them in the record, Mr. Hussell's concessions say that the Hearing Panel got it right. The majority therefore should have adopted their recommendation.

LOUGHRY, Justice, dissenting:

This Court's faithful and consistent oversight of lawyer disciplinary matters is among the highest duties owed to the citizens of the State of West Virginia. Yet in a virtually unprecedented decision, the majority dismissed charges and resulting sanctions against a lawyer *who had expressly consented to the recommended sanctions* made by the Hearing Panel Subcommittee ("HPS"). To be clear, Mr. Hussell did not come before this Court asking to have the findings of the HPS or its recommended sanctions set aside. In fact, Mr. Hussell requested in his brief *"that the recommended sanctions be imposed* [.]" (emphasis added). To reach its unwarranted result, the majority completely disregards the factual findings made by the HPS—the body charged with making those factual determinations—and casually discards the implications of Mr. Hussell's consent to the recommended disposition. The majority's result-oriented opinion is nothing more than a work of fiction that will assuredly send a message that this Court is more interested in *protecting* its own than *policing* its own. The image of the West Virginia legal system will once again be sullied as ethical considerations are cast aside along with any concerns for protecting the public.

This Court's standard of review in disciplinary matters requires plenary review of "questions of law, questions of application of the law to the facts, and questions of appropriate sanctions[.]" Syl. Pt. 2, in part, *Lawyer Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850 (1995). "On the other hand, *substantial deference* is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." *Id.* (emphasis supplied). The lone factual issue presented in this case, and resolved by the HPS, was whether James L. terminated the attorney-client relationship that he and his wife, Carolyn L., had with Mr. Hussell during their conversation of January 10, 2010. If he did not, then Mr. Hussell's subsequent actions relative to his sexual relationship with Carolyn L. violated various Rules of Professional Conduct. The HPS concluded that the attorney-client relationship was *not* terminated during that conversation. Without question, this conclusion

was supported by "reliable, probative, and substantial evidence," all of which was conveniently ignored by the majority.

In addition to the fact that James L. and Carolyn L. each signed a consent to joint representation *after* the January 10, 2010, conversation, they both testified that the attorney-client relationship continued following this conversation. Carolyn L. testified before the HPS, as follows:

Q. And what did you believe that meant when you signed this [joint representation] letter on January 14th of 2010?

A. That he was going to continue to represent [James L.].

. . . .

Q. In what way would that [sexual relationship] have hurt his job?

A. Because at the time technically he was our attorney so I was just worried. I didn't want it to hurt his career.

Completely ignoring the foregoing, the majority cites an isolated statement from Carolyn L.'s testimony to contend that Carolyn L. did not believe an attorney-client relationship existed. The majority looked to her explanation that she "didn't really think of [Mr. Hussell] as an attorney. I just thought of him as my friend." This single statement, which was seized upon by the majority to justify its result, has literally nothing to do with whether there was an attorney-client relationship.

Of more import is the fact that James L. clearly expressed to Mr. Hussell during their January 10, 2010, conversation that he had yet to obtain alternate counsel and, subsequently, James L. explained that he signed the joint representation document to cover any additional work Mr. Hussell might perform while he was searching for substitute counsel:

Q. What was your intention on signing this on January 14th, 2010, then?

A. .... because I didn't have an estate planner at that point. So I didn't know if he was going to do some more work for us and then send that to us....

To whatever extent the foregoing does not plainly express James and Carolyn L.'s belief

that Mr. Hussell was still their attorney pending their search for a new one, James L. testified: "I still thought he was my attorney, though. I mean the thing is he said he was going to do my estate."

The majority has selectively adopted its own view of the vague descriptions of the January 10, 2010, conversation to determine that a "clear" termination of the attorney-client relationship occurred. The majority does so without a hint of discussion about the somewhat obvious, yet well-articulated premise, that whether an attorney-client relationship has been terminated is a question for the fact-finder. "[T]he question of when an attorney-client relationship for a particular undertaking or transaction has terminated is necessarily one of fact." *Omni–Food & Fashion v. Smith*, 38 Ohio St.3d 385, 528 N.E.2d 941, 944 (1988); *see Ruf v. Belfance*, 2013 WL 243992, at *3 (Ohio Ct.App. Jan. 23, 2013) ("Generally, the determination of whether an attorney-client relationship has ended is a factual question to be resolved by the trier of fact."); *Mobberly v. Hendricks*, 98 Ohio App.3d 839, 649 N.E.2d 1247, 1249 (1994) (citations omitted) ("In determining when the attorney-client relationship is terminated, the court must point to an affirmative act by either the attorney or the client that signals the end of the relationship. For a trial court to take this issue away from a jury, such an act must be clear and unambiguous."); *Bee v. McNamara*, 2006 WL 895014, at *1 (Conn.Super.Ct. Mar. 23, 2006) (finding that genuine issue of fact precluded determination as to whether client effected de facto termination of his relationship with defendant); *McGehee v. Johnson*, 2006 WL 3019823, at *3 (Mich.Ct.App. Oct. 24, 2006) ("Although a formal discharge is not required to terminate an attorney-client relationship, any claim that plaintiff impliedly terminated the relationship raises additional factual issues.").

The majority has elevated the expressions of distrust made by James L. to Mr. Hussell during their January 10, 2010, conversation and wholly ignored the remainder of the evidence as to what was conveyed in that conversation. James L. testified that during this conversation he stated:

I'm uncomfortable with the phone calls and your relationship with my wife, and I think

in terms of my estate I really have to look after my children and make sure that they have an iron clad estate so people can't come back and find holes and gaps.... I have talked to Ditsy Keightley at BB & T and she said she could probably find me another estate planner.

Mr. Hussell did not disagree with this characterization of their conversation, testifying that "the facts are basically as he [James L.] relayed it." Mr. Hussell testified that James L. advised him that "he was uncomfortable with my representation of him. He had contacted Ditsy and was going in a different direction." Critically, however, "[w]hile a lack of trust may lead to the termination of the attorney-client relationship, that lack of trust and confidence does not necessarily signal termination of the relationship." *Thayer v. Fuller & Henry, Ltd.*, 503 F.Supp.2d 887, 892 (N.D.Ohio 2007); *see R.E. Holland Excavating, Inc. v. Martin, Browne, Hull & Harper, P.L.L.*, 162 Ohio App.3d 471, 833 N.E.2d 1273, 1276 (2005) (holding that "lack of trust and confidence does not constitute the termination of the [attorney-client] relationship"); *Ruf*, 2013 WL 243992, at *3 ("The termination of the attorney-client relationship depends, not on a subjective loss of confidence on the part of the client, but on conduct, an affirmative act by either the attorney or the client that signals the end of the relationship." (quoting *Mastran v. Marks*, 1990 WL 34845 (Ohio Ct.App. Mar. 28, 1990))); *McOwen v. Zena*, 2012 WL 4714038 (Ohio Ct.App. Sept. 27, 2012) (finding that letter by client to attorney equivocally informing him that she intended to terminate him as her attorney did not terminate the attorney-client relationship).

In a half-hearted effort to "reverse engineer" a termination of the attorney-client relationship necessary to vacate the disciplinary charges, the majority identifies three utterly illogical factors to support its position that the attorney-client relationship had been terminated. The majority states that it "finds probative" the fact that Mr. Hussell performed no work after January 10, 2010; that neither James nor Carolyn L. asked him to perform work after that date; and that Mr. Hussell did not "signify his acceptance" of the joint representation letter. The majority ignored the strongest and most obvious

evidence that James and Carolyn L. believed that Mr. Hussell continued to be their attorney—as reflected by their *signing and returning the joint representation agreement* after January 10, 2010. The fabricated determinants cited by the majority illogically suggest that an attorney must perform perpetual services for all clients, without pause, lest the attorney-client relationship be deemed to have ended. Moreover, it suggests that a client must constantly demand updates and further services for fear that any lull in the relationship may be construed as a termination sufficient to allow the attorney to violate their interests and trust. Finally, the suggestion that an attorney who sends out a joint representation agreement that is then accepted and signed by the clients must thereafter "accept the acceptance" is ludicrous and deserves no further comment.[1]

As noted above, the majority's dismissal of the sanctions to which Mr. Hussell had consented is *virtually* unprecedented. Unfortunately, however, this is not the first occasion the majority has taken such an inexplicable position. In *Lawyer Disciplinary Board v. Jarrell*, 206 W.Va. 236, 523 S.E.2d 552 (1999), a narrow majority of the Court dismissed charges against a prosecuting attorney after she consented to admonishment for the charges. In that case, the Court noted that only in "rare instances" may there be "extraordinary mitigating circumstances" which would justify its dismissal of agreed-upon sanctions. *Id.* at 244, 523 S.E.2d at 560. In a strongly worded dissent, Justice Davis bemoaned the "uncertainty" created by the majority's "unwillingness[ ] to accept recommended dispositions which are consented to by the parties." *Id.* Justice Davis found there was "no justifiable reason for [the] Court to have refused to adopt the recommended decision of the HPS, which was consented to by [the respondent]." *Id.* at 245, 523 S.E.2d at 561. As Justice Davis aptly noted, the majority's disregard of the respondent's consent to the disposition simply "created more embarrassment and humiliation for [the respondent] by etching the details of her ethical violations forever in the law reporters of this State. This undoubtedly was something she was hoping to avoid by voluntarily consenting to [the disposition]." *Id.* As was the case in *Jarrell*, Mr. Hussell's decision to consent to the recommended disposition of the HPS was likely impelled by a desire to minimize negative publicity, accept the consequences of his actions, and move forward with the rest of his professional life.

In short, the majority has performed a disservice to both the rule of law and Mr. Hussell. Accordingly, I respectfully dissent.

---

1. Additionally, the majority's reliance on Mr. Hussell's purported "reasonable belief" that he had been fired is completely incorrect. *United States v. Dennis*, 843 F.2d 652, 657 (2d Cir.1988)

("The key . . . to whether an attorney/client relationship existed is the intent of the client[.]").